UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO: 4:12-CV-00083-BR

| | | |
|---|---|---|
| ASCEND HEALTH CORPORATION, | ) | |
| UHP, LP, d/b/a | ) | |
| UNIVERSITY BEHAVIORAL HEALTH OF | ) | |
| DENTON, | ) | |
| RICHARD KRESCH, M.D., | ) | |
| ATIQUE KHAN, M.D., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| BRENDA WELLS, | ) | |
| JOHN AND JANE DOE 1 - 10, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendant Brenda Wells's motions to dismiss.[1] The motions have been fully briefed and are ripe for disposition.

## I. BACKGROUND

Plaintiffs are entities and individuals affiliated with a private psychiatric hospital in Denton, Texas. That hospital is plaintiff UHP, LP doing business as University Behavioral Health of Denton ("UBH"), a Delaware limited partnership with its principal place of business in Denton, Texas. (Compl., DE # 1, ¶ 6.) Plaintiff Atique Khan, M.D., is UBH's medical director and is a resident of Texas. (Id. ¶ 7.) Plaintiff Ascend Health Corporation ("Ascend"), a Delaware corporation, owns UBH, and its President and Chief Executive Officer is plaintiff

---

[1]Wells filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE # 16.) She contemporaneously filed a "special" motion to dismiss pursuant to the Texas Citizens Participation Act, Tex. Civ. Prac. & Rem. Code § 27.001 *et seq.*, (DE # 17), which is a law pertaining to anti-strategic lawsuits against public participation ("anti-SLAPP"). The distinction between the motions is discussed below.

Richard Kresch, M.D., who is a resident of New York.  (Id. ¶¶ 5, 8.)  Defendant Wells is a resident of North Carolina who was a patient at UBH.  (Id. ¶ 9.)

According to plaintiffs, after the August 2010 dismissal of Wells's action in Texas state court against UBH and Khan, Wells and the Doe defendants (through communications to Wells) began defaming plaintiffs on various internet sites.  (Id. ¶¶ 2, 10.)  Specifically, plaintiffs allege that Wells is the registrant and/or creator of two internet blogs on which she has posted defamatory statements about plaintiffs.  (Id. ¶¶ 24, 25, 35.)  They further allege that she has also posted such statements on other websites and has created a Facebook page, YouTube channel, and Twitter feed, all of which link to one of her blogs.  (Id. ¶¶ 33, 37, 39, 41, 44, 46, 48, 50, 52, 53.)  They claim that she has used copyrighted images and a copyrighted still image from a video from UBH's and Ascend's websites without a license.  (Id. ¶¶ 29(h), 29(i), 37(a), 39(a), 54.)  Based on this conduct, plaintiffs assert the following claims against defendants: (1) "defamation/libel" under North Carolina law; (2) violation of North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq.; (3) libel under Texas law; (4) business disparagement under Texas law; (5) copyright infringement under 17 U.S.C. § 101 et seq. and §§ 501-05; and, (6) civil conspiracy.  Plaintiffs seek injunctive relief, compensatory, punitive, and treble damages, and attorneys' fees.

## II.  DISCUSSION

### A.    Choice of Law

The first issue the court must address is which state's substantive law applies to

2

plaintiffs' tort claims. The parties agree that either North Carolina or Texas law applies.[2] The

parties also agree that North Carolina's choice-of-law rules govern the determination of this

issue. According to the North Carolina Court of Appeals:

> Our Supreme Court has made clear that lex loci delicti ("lex loci") is the appropriate choice of law test to apply to tort claims.
>
>> Our traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim, and remedial or procedural rights are determined by lex fori, the law of the forum. For actions sounding in tort, the state where the injury occurred is considered the situs of the claim. Thus, under North Carolina law, when the injury giving rise to a negligence or strict liability claim occurs in another state, the law of that state governs resolution of the substantive issues in the controversy.
>
> Our Courts have "consistently adhered to the lex loci rule in tort actions."
>
> . . . .
>
> . . . . "[F]or the causes of action that are normally considered to be torts . . . the law of the state where the plaintiff was injured controls the outcome of the claim." The plaintiff's injury is considered to be sustained in the state "where the last act occurred giving rise to [the] injury." . . . .
>
> . . . .
>
>> In jurisdictions which apply the rule of lex loci delicti, an issue may arise as to whether the law of the state where an allegedly wrongful act or omission took place or that of the state where the injury or other harm was sustained should apply. In such a case, the place of the tort generally is considered to be the state where the injury or harm was sustained or suffered, and as a general rule, a victim should recover under the system in place where the injury occurred. That is, the situs of the

---

[2]Although plaintiffs Ascend and Kresch apparently have a principal place of business and residence, respectively, in states other than North Carolina or Texas, no one argues that the law of those other states should apply.

> tort ordinarily is the state where the last event
> necessary to make the actor liable or the last event
> required to constitute the tort takes place, and the
> substantive law of such state applies.

Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 722-23, 724 (N.C. Ct. App. 2010)

(citations omitted) (alterations in original).

As this court has noted in the past, "the general rule for defamation claims is the place of

harm is the place of publication." Verona v. U.S. Bancorp, No. 7:09-CV-00057-BR, 2011 WL

1252935, at *10 n.6 (E.D.N.C. Mar. 29, 2011) (citing Wells v. Liddy, 186 F.3d 505, 521-22 (4th

Cir. 1999), applying Maryland's lex loci delicti rule). This rule presumes that the defamatory

statement is published (i.e., communicated to third parties) in one geographic location. See

Wells, 186 F.3d at 522 (recognizing that application of the lex loci delicti rule is straightforward

where the defamation claim was based on a speech broadcasted and heard solely in Virginia and

thus Virginia law applies). In this case, however, the publication of the allegedly defamatory

statements occurred over the internet, meaning multistate (if not, worldwide) publication took

place. As far as the court is aware, and the parties do not suggest otherwise, the North Carolina

Supreme Court (nor its Court of Appeals for that matter) has not had the opportunity to apply the

lex loci delicti rule to a defamation claim, let one involving multistate publication.

Accordingly, this court must predict how that court would rule. See id. at 527-28 (noting a

federal court's obligation, in a diversity case, to predict how the forum state's highest court

would decide the issue, if the law is unclear). Despite North Carolina's being in the minority of

jurisdictions to still apply the lex loci delicti rule, see Peter Hay et al., Conflict of Laws § 2.16

(5th ed. 2010) (stating that by the turn of century, 42 states had abandoned the rule), it is

doubtful that the North Carolina court would abandon that rule in favor of the "most significant

4

relationship" test which Wells advances, see Mosqueda v. Mosqueda, 721 S.E.2d 755, 761 (N.C. Ct. App.) (noting North Carolina's "strong adherence" to the "traditional" rule), review denied, 724 S.E.2d 919 (N.C. 2012). The court predicts that in a case of multistate defamation, while still adhering to the lex loci delicti rule, the North Carolina Supreme Court would apply Texas law because the alleged injury to plaintiffs, in the form of reputational and financial harm, is centered in Texas, as that state is where UBH and Khan are located, and the allegedly defamatory remarks concern UBH, Khan, and Ascend's and Kresch's operation of UBH. Simply put, Texas is the location where plaintiffs sustained their harm, (see Young Decl., DE # 21, ¶ 8 (identifying financial harm as loss of patients at UBH)), and its law will apply to plaintiffs' tort claims.

Because Texas law applies, plaintiffs' claim for defamation/libel under North Carolina law obviously is not viable. Plaintiffs' claim for violation of North Carolina's Unfair and Deceptive Trade Practices Act fails for the same reason. See Martinez v. Nat'l Union Fire Ins. Co., No. 5:12-CV-170-D, 2012 WL 5993754, at *5 (E.D.N.C. Nov. 30, 2012) (applying the law of the situs test to dismiss the plaintiff's North Carolina unfair and deceptive trade practice claim on the ground that the plaintiff had failed to plausibly allege that she suffered financial injury in North Carolina and thus North Carolina law did not apply).

B.      Applicability of the Texas Citizens Participation Act

As noted above, Wells filed one of the motions to dismiss pursuant to the Texas Citizens Participation Act ("CPA"), Tex. Civ. Prac. & Rem. Code § 27.001 et seq. "The purpose of this [act] is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by

5

law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code § 27.002. "The CPA provides a means for a defendant, early in the lawsuit, to seek dismissal of certain claims identified in the act, including defamation." Avila v. Larrea, No. 05-11-01637-CV, 2012 WL 6633994, at *3 (Tex. App. Dec. 18, 2012) (citations omitted). Significantly, it sets forth the parties' burdens of proof upon the filing of a motion to dismiss and what the court must consider in ruling on that motion, which are discussed further below. See Tex. Civ. Prac. & Rem. Code §§ 27.005(b), (c), 27.006(a). The parties debate the applicability of this law.

Plaintiffs argue that the court should not apply the CPA because it is contrary to North Carolina public policy. Under North Carolina's choice-of-law rules, it will not enforce any law which violates its public policy.

> "It is thoroughly established as a broad general rule that foreign law or rights based thereon will not be given effect or enforced if opposed to the settled public policy of the forum." However, the mere fact that the law of the forum differs from that of the other jurisdiction does not mean that the foreign statute is contrary to the public policy of the forum. To render foreign law unenforceable as contrary to public policy, it must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state. This public policy exception has generally been applied in cases such as those involving prohibited marriages, wagers, lotteries, racing, gaming, and the sale of liquor.

Mosqueda, 721 S.E.2d at 760 (citations omitted).

Plaintiffs suggest that the CPA is contrary to North Carolina public policy as North Carolina does not have a similar statute and instead relies upon the common law and its unfair

and deceptive trade practices act to evaluate defamation claims.  (See Pls.' Br., DE # 20, at 10-11.)  The court disagrees.  While North Carolina has not enacted an anti-SLAPP statute and it does not appear that North Carolina courts have had the opportunity to apply another state's anti-SLAPP law, those facts alone do not mean that the Texas law offends the good morals or natural justice of North Carolina or works an injustice to its citizens.  This case does not touch upon any issue which might implicate North Carolina public policy, such as the regulation of marriage or the welfare of its citizens.  Applying the CPA to a case involving a North Carolina citizen's alleged defamation of a Texas entity, a Texas citizen, and an entity and person who are connected with the operations of the Texas entity is not against North Carolina public policy.

Plaintiffs further contend that the CPA does not apply because it is a procedural, rather than a substantive, law.  (Id. at 6-7.)  This court, sitting in diversity, applies federal procedural law.  Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996).  "However, the Supreme Court has also noted that where a state's procedural rule is bound up with substantive policy, a federal court is to apply the state rule."  Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109 (4th Cir. 1995) (citing Byrd v. Blue Ridge Rural Elec. Co-op., 356 U.S. 525, 535 (1958)) (footnote omitted).  Without delving into this complex area, it is enough to say that some courts deem a state's anti-SLAPP statutes as substantive, see, e.g., Godin v. Schencks, 629 F.3d 79 (1st Cir. 2010) (Maine); United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963 (9th Cir. 1999) (California); Russell v. Krowne, Civil Action No. DKC 2008-2468, 2010 WL 2765268 (D. Md. July 12, 2010) (Maryland), while others have not, see, e.g., 3M Co. v. Boutler, 842 F. Supp. 2d 85 (D.D.C. 2012) (District of Columbia).  The court did not locate any case considering the CPA in this context.

Fortunately, this court need not resolve the issue. As recognized previously, Wells has filed two motions to dismiss. She advances a total of eight grounds for dismissal of plaintiffs' libel claim. (See Def.'s Br, DE # 19, at 12-13.[3]) Four of those grounds can be analyzed under the familiar Rule 12(b)(6) standard, without any reference to the CPA. (See id. at 13 n.6.) As for the other four grounds, the court will assume, without deciding, that the CPA applies. The court will likewise assume, without deciding, that the CPA applies to plaintiffs' business disparagement claim. For plaintiffs' remaining state tort claim of civil conspiracy, the court will analyze it pursuant to Rule 12(b)(6).[4]

C.    Standard of Review

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), tests 'the sufficiency of a complaint,' and 'importantly does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" Purcell v. City of Greensboro, No. 1:11CV577, 2012 WL 1718763, at *2 (M.D.N.C. May 14, 2012) (citations omitted).

> Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.

Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 2009) (citations omitted). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the

---

[3]Page citations to Wells's brief are to the page numbers generated by cm/ecf.

[4]Wells does not contend that the CPA applies to plaintiffs' lone federal claim of copyright infringement. (See Def.'s Br., DE # 19, at 28 n.9.)

8

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the well-pleaded complaint need not provide detailed factual allegations, the complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Under the CPA, "[i]f a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action." Tex. Civ. Prac. & Rem. Code § 27.003(a). "'Exercise of the right of free speech' means a communication made in connection with a matter of public concern," id. § 27.001(3), which "includes an issue related to . . . health or safety," id. § 27.001(7)(A). Upon the filing of a motion to dismiss, the court is required to dismiss an action if the movant "shows by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of . . . the right of free speech . . . ." Id. § 27.005(b)(1). "The court may not dismiss a legal action . . . if the party bringing the legal action establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." Id. § 27.005(c). "In determining whether a legal action should be dismissed . . ., the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." Id. § 27.006(a).

D.     Libel

Under Texas law,

> [a] libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any

9

> person's honesty, integrity, virtue, or reputation or to publish the
> natural defects of anyone and thereby expose the person to public
> hatred, ridicule, or financial injury.

Id. § 73.001. "To maintain a cause of action for defamation, . . . a plaintiff must prove that the defendant: (1) published a statement 'of and concerning' him; (2) that was defamatory; (3) with the requisite degree of fault with respect to whether it was false." Neely v. Wilson, 331 S.W.3d 900, 912 (Tex. App. 2011) (citations omitted). The requisite degree of fault is actual malice, if the plaintiff was a public official or public figure, and negligence, if the plaintiff was a private individual. WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998).

> In addition, a libel plaintiff must establish injury and
> damages from the statement. If the statement is "defamatory per
> se"— of a nature that the law considers so damaging to reputation
> that harm to the plaintiff's reputation is presumed— the plaintiff
> need not plead or prove specific injury or damage to reputation.
> Otherwise, the statement is "defamatory per quod," and the
> plaintiff must prove specific injury and damages to prevail.

Neely, 331 S.W.3d at 913 (citation omitted). Statements which are defamatory per se "include statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation." Main v. Royall, 348 S.W.3d 381, 390 (Tex. App. 2011) (citation omitted).

The first ground that Wells raises in support of dismissal of the libel claim is plaintiffs have failed to allege the defamatory statements *in haec verba* or with sufficient particularity.

> Texas courts have long required defamation plaintiffs to set forth
> in their pleadings "the particular defamatory words, or at least their
> substance and meaning." In federal court, however, the adequacy
> of a plaintiff's pleadings is judged according to the Federal Rules
> of Civil Procedure. Federal courts have, accordingly, consistently
> refused to require plaintiffs to set forth allegedly defamatory
> statements *en haec verbis*.

<u>Barber v. Nationwide Commc'ns, Inc.</u>, No. Civ. 3:95-CV-0656-H, 1995 WL 940517, at *3 (N.D.

Tex. May 30, 1995) (citations omitted). Whatever standard applies– the general notice

requirement of Federal Rule of Civil Procedure 8(a) or Texas's particularity requirement– the

court finds that plaintiffs have sufficiently pled their libel claim. As for at least some of the

allegedly defamatory statements, plaintiffs have quoted verbatim the relevant portion of the

statement Wells made about one or more of them and set forth the date and website on which she

posted it. That plaintiffs may not have alleged the same with respect to each of the more than 50

purportedly libelous statements does not mean their libel claim in its entirety fails, and the court

will not dismiss it on this ground.

The court considers Wells's second and third grounds for dismissal of the libel claim

together. She argues that the alleged statements are expressions of opinion and/or hyperbole and

are non-defamatory.

> [A] defamatory statement must be sufficiently factual to be
> susceptible of being proved objectively true or false, as contrasted
> from a purely subjective assertion. It must also be such that a
> reasonable factfinder could conclude that the statement implies an
> actual assertion of the purported fact, as contrasted from loose,
> figurative, or hyperbolic language that would negate the
> impression that the declarant was seriously maintaining that the
> fact was literally true.
>      An allegedly defamatory publication is construed as a
> whole in light of the surrounding circumstances based on how a
> person of ordinary intelligence would perceive it. The appropriate
> inquiry is thus objective, not subjective. Whether a statement is
> capable of a defamatory meaning is generally a question of law for
> the court. But when a publication is of ambiguous or doubtful
> import, the jury must determine its meaning.

<u>Thomas-Smith v. Mackin</u>, 238 S.W.3d 503, 507 (Tex. App. 2007) (citations and footnote

omitted).

11

While some of the alleged statements in this case are clearly ones of opinion, (see, e.g., Compl., DE # 1, ¶ 39(c) ("'. . .[t]hey serve one variety of shitty food every day. You can take it or leave it.'" (omission and alteration in original))), others are not, (see, e.g., id. ¶¶ 29(j) ("a UBH employee raped a patient at the facility"); 29(m) ("when a patient signed a letter refusing medical treatment, UBH and Dr. Khan 'began to shun her, refuse [sic] to feed her, and the patient advocate threatened to send her to the state mental hospital'"); 59(t) (accusation of the falsification or alteration of medical records). Further, other statements are arguably defamatory when considered in their entirety. For example, in one of her posts, Wells allegedly states that "'a former nurse from their facility has told me that when they hold daily staff meetings, the discussion emphasizes the patient's insurance benefits.'" (Id. ¶ 59(c).) The title of the post is "'Why does UBH Denton Hold People Against their Will? Because it pays. Duh.'" (Id.) When reading the post and its title, they conceivably convey that UBH commits insurance fraud and falsely imprisons its patients, which is sufficiently factual to be proved true or false and therefore could be defamatory. As with the first ground Wells advances, because some of the alleged statements are actionable, the court will not dismiss the entire libel claim.

Fourth, Wells urges the court to dismiss the libel claim under Section 509 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1). This section "precludes plaintiffs from holding interactive computer service providers liable for the publication of information created and developed by others." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 252 (4th Cir. 2009) (footnote and citations omitted). As the Fourth Circuit Court of Appeals has summarized,

> [t]he CDA bars the institution of a "cause of action" or imposition of "liability" under "any State or local law that is inconsistent"

12

with the terms of § 230.  As relevant here, § 230 prohibits a "provider or user of an interactive computer service" from being held responsible "as the publisher or speaker of any information provided by another information content provider."  Assuming a person meets the statutory definition of an "interactive computer service provider," the scope of § 230 immunity turns on whether that person's actions also make it an "information content provider."  The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."

Taken together, these provisions bar state-law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties. Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.  State-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the interactive computer service provider who merely enables that content to be posted online.

Id. at 254 (citations omitted).

It is well settled that website operators "are providers of interactive computer services."  . . . .

Indeed, the "prototypical service qualifying for this statutory immunity [under § 230(c)(1)] is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." . . . .

. . . . As the Fourth Circuit explained in its touchstone decision in *Zeran v. America Online, Inc.*, [129 F.3d 327, 330 (4th Cir. 1997)]: "§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions— such as deciding whether to publish, withdraw, postpone or alter content— are barred."  It is "immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material."  Moreover, "an editor's minor changes to the spelling, grammar, and length of third-party content do not strip him of section 230 immunity."

Nevertheless, § 230(c)(1) "was not meant to create a lawless no-man's-land on the Internet."  In the words of the statute,

13

> if the information on which liability is based was not "provided by
> *another* information content provider," an interactive computer
> service provider will not be entitled to immunity under § 230(c)(1)
> (emphasis added).  The Ninth Circuit explained in *Fair Housing
> Council [of San Fernando Valley v. Roommates.com, LLC*, 521
> F.3d 1157, 1162–63 (9th Cir. 2008)]:
>
>> A website operator can be both a service provider
>> and a content provider: If it passively displays
>> content that is created entirely by third parties, then
>> it is only a service provider with respect to that
>> content.  But as to content that it creates itself, or is
>> "responsible, in whole or in part" for creating or
>> developing, the website is also a content provider.
>> Thus, a website may be immune from liability for
>> some of the content it displays to the public but be
>> subject to liability for other content.

Hare v. Richie, No. Civ. ELH-11-3488, 2012 WL 3773116, at *15-16 (D. Md. Aug. 29, 2012)

(most citations omitted).

Wells argues that she is immune from liability because, as to some of the statements at

issue, she "simply . . . re-post[ed] content provided by a third party."  (Def.'s Br., DE # 19, at

19.)  Specifically, she points to two statements on her blog which plaintiffs allege are

defamatory.  (Id. at 19-20.)  As to one statement, plaintiffs allege that Wells removed the name

of the commentator, and with the other, plaintiffs allege it was purportedly authored by the

mother of a former UBH patient.  (Compl., DE # 1, ¶¶ 59(g), 59(r).)  Therefore, Wells argues,

because the statements were authored by others and published on her website, albeit with some

edits, she cannot be held liable for those statements.  The court assumes, without deciding, that

Wells, as an operator of a blog on the internet which accepts commentary for posting, is a

provider of an interactive computer service for purposes of § 230.  As such, if she in fact only

allowed others' content to be posted or re-posted on the blog, even with minor editorial changes

on her part, she would be entitled to immunity.  However, what plaintiffs allege Wells did goes

beyond that conduct. Plaintiffs allege that Wells herself created some of the defamatory statements on her blog. Furthermore, as to the defamatory statements based on information provided by others, it is not evident the extent to which Wells may have made more than mere editorial changes to that information, and the court agrees with plaintiffs that discovery should bear this out. Section 230 immunity does not cover content which Wells created herself or other content, although originating with a third party, which Wells significantly altered. See Hare, 2012 WL 3773116, at *16-17. Plaintiffs' allegations encompass such content, and therefore, the libel claim will not be dismissed on this ground.

As for the four additional grounds that Wells cites in support of dismissal of the libel claim, she urges the court to apply the CPA's burden-shifting and evidentiary standards. (Def.'s Br., DE # 19, at 13 n.6.) As previously recognized, the court will only do so because it assumes, without deciding, that the CPA applies.

The fifth ground that Wells advances is the truth or substantial truth of the statements at issue. "The truth of a statement is an absolute defense to a claim for defamation." Klentzman v. Brady, 312 S.W.3d 886, 898 (Tex. App. 2009) (citation omitted). Likewise, one cannot be held liable if a statement is substantially true, i.e., the substance or gist of a statement is accurate.[5] Id. at 899.

The court simply cannot resolve the issue as a matter of law at this time. According to the declaration of UBH's Chief Executive Officer, many of the statements Wells posted on the

_____

[5]As one district court has recognized, "[t]he Texas Supreme Court has only applied the 'substantial truth' defense in the context of media defendants. But several Texas courts of appeals have applied the 'substantial truth' defense to private defendants, without discussing the distinction between the two types of defendants." Rhodes Colleges, Inc. v. Johnson, No. 3:10-CV-0031-D, 2012 WL 627273, at *8 n.10 (N.D. Tex. Feb. 27, 2012) (citations omitted). Plaintiffs do not argue that the defense does not apply here, and therefore, the court will assume it applies, without deciding whether Wells is a "media defendant."

Internet are false. (Young Decl., DE # 21, ¶¶ 6-7.) Wells, on the other hand, swears that to her knowledge, the content she authored is accurate, and to the extent she wrote about the experiences of others, that content is accurate. (Wells Decl., DE # 18, ¶¶ 13-15.) This factual dispute precludes the court from ruling as a matter of law that the statements are true or substantially true.

Wells's sixth ground for dismissal of the libel claim is plaintiffs' purported inability to prove she acted negligently in regards to the truth of the statements.[6] Plaintiffs must show that Wells knew or should have known that the defamatory statements were false. See French v. French, 385 S.W.3d 61, 73 (Tex. App. 2012). The dueling declarations of Wells and UBH's Chief Executive Officer show that a genuine issue of material fact exists as to Wells's fault, and therefore, the court cannot rule as a matter of law regarding the issue.

Seventh, Wells contends that the alleged statements are protected by Texas's statutory fair reporting privilege, Tex. Civ. Prac. & Rem. Code § 73.002(a). That statute provides:

> The publication by a newspaper or other periodical of a matter covered by this section is privileged and is not a ground for a libel action. This privilege does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern.

Tex. Civ. Prac. & Rem. Code § 73.002(a). Relevant to this case, the statute "applies to . . . reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information." Id. § 73.002(b)(2).

The court finds that the privilege does not cover the statements on Wells's blogs because

---

[6]Wells acknowledges that "there is not sufficient evidence at this point to ascertain whether any of the Plaintiffs are, for purposes of this matter, public figures[.]" (Def.'s Br., DE # 19, at 21.) Therefore, the court will not apply the actual malice standard to the libel claim.

neither blog is a "newspaper or other periodical" under § 73.002(a).[7]  While the statute does not

define these words, they are commonly used, and it is not apparent from the plain language or

the legislative history of the statute that anything other than the commonly accepted definitions

were intended.  See Fitzjarrald v. Panhandle Pub. Co., 228 S.W.2d 499, 504, 505 (Tex. 1950)

("The Act[, i.e., Article 5432, § 73.002's predecessor,] was clearly designed to permit

newspapers and magazines to obtain and publish information on public matters and regarding

candidates for public office. . . .  Article 5432 was enacted to soften the harsh rule that had

subjected newspapers to damages for publishing certain matters, and authorized newspapers,

without being liable for any action for libel, to publish 'A reasonable and fair comment or

criticism of the official acts of public officials and of other matters of public concern published

for general information.'").  "Newspaper" is "a paper that is printed and distributed daily,

weekly or at some other regular and usu[ally] shorter interval and that contains news, articles of

opinion (as editorials), features, advertising, or other matter regarded as of current interest" and

"an organization engaged in composing and issuing" the same.  Webster's Third New

International Dictionary 1524 (1993).  "Periodical" is defined as "a magazine or other

publication– of which the issues appear at stated or regular intervals– usu[ally] used of a

publication appearing more frequently than annually but infrequently used of a newspaper."  Id.

at 1680.  While these definitions connote something physically printed, a reasonable statutory

interpretation in light of current society's reliance upon the internet for dissemination of

information would likely include newspapers and other periodicals which publish on the internet.

_____

[7]As noted previously, plaintiffs allege that Wells published defamatory statements not only on her blogs but also on other websites, for example, dallas.craigslist.org.  Obviously, the privilege would not extend to the statements Wells made on those other websites.

See Kaufman v. Islamic Soc'y of Arlington, Tex., 291 S.W.3d 130, 140 (Tex. App. 2009) ("[A]rticles communicated through the internet equate in legal effect in some circumstances to words published by more traditional electronic or print media.").  However, Wells's internet blogs are not akin to a newspaper or other periodical, even one published electronically. Postings on the blog are not published at regular intervals.  They are not composed of articles, news items, or the like.  Accordingly, Wells's blogs are not covered by the privilege under § 73.002.  Cf. id. at 138-42 (concluding that author of an allegedly defamatory article published in internet magazine qualified him as a "member of the electronic or print media" under a statute permitting appeal from an interlocutory order regarding summary judgment on claims or defenses that arise under the First Amendment and stating "[w]e do not hold . . . that everyone who communicates on the internet would qualify as a member of the electronic media under [the statute]").

Finally, Wells argues that plaintiffs' libel claim should be dismissed because the applicable statute of limitations, see Tex. Civ. Prac. & Rem. Code § 16.002(a), bars the claim to the extent it is based on statements published more than one year prior to the filing of the complaint, i.e., statements published prior to 3 May 2011.  Plaintiffs acknowledge that "[m]any of the statements alleged in the Complaint fall within this period, though . . . some do not." (Pls.' Br., DE # 20, at 13.)  The court agrees with the parties that any statements published prior to 3 May 2011 are not actionable.  However, because some of the allegedly defamatory statements were published within the limitations period, the court will not dismiss the libel claim

18

in its entirety.[8]

      E.      <u>Business Disparagement</u>

> Under Texas law, business disparagement requires publication by the defendant of statements that are false, maliciously stated, not privileged, and result in special damages. Unlike defamation, a claim for business disparagement always requires a plaintiff to prove actual malice. A plaintiff must show that the defendant knew its statements were false or acted with reckless disregard for their falsity; acted with ill will or with an intent to interfere in the plaintiff's economic interests; and had no privilege to do so. To prove special damages, a plaintiff must provide evidence "that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings."

<u>Rimkus Consulting Grp., Inc. v. Cammarata</u>, 688 F. Supp. 2d 598, 670-71 (S.D. Tex. 2010)

(citations omitted).

      Wells submits that plaintiffs cannot prove any of these elements. The court disagrees.

For the reasons stated with regard to plaintiffs' libel claim, plaintiffs have met their burden as to

the publication of false statements that are not privileged. As to whether Wells acted with actual

malice, the court agrees with plaintiffs that when one considers her false statements and their

context, particularly on her blogs, one might reasonably infer that she acted with actual malice.

Additionally, the court concludes that plaintiffs have come forward with sufficient proof, that

being, the sworn testimony of UBH's Chief Executive Officer, of special damages. She states

that the allegedly defamatory statements "have caused harm in the form of a reduction of patient

days, particularly among youth inpatient and women's services." (Young Decl., DE # 21, ¶ 8.)

---

[8]Regarding the seventh and eighth grounds that Wells asserts in support of dismissal of the libel claim, the court notes that it did not need to resort to the CPA's burden shifting and evidentiary standards to make its determination.

In particular, she cites to one instance where "an adult patient completed an assessment to be admitted to UBH and then declined treatment with UBH, asserting concerns due to Wells' website." (Id. ¶ 8(a)(ii).) She further swears that "Plaintiffs have lost customers, business, and income as a result of the actions of the Defendants." (Id. ¶ 8(a)(iii).) Such evidence is sufficient to overcome the motions to dismiss.

F.    Civil Conspiracy

> Under Texas law, a claim of civil conspiracy requires the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." To satisfy the "meeting of the minds" element, [the plaintiff] must allege that defendants had the "specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." Defendants must have been "aware of the harm or wrongful conduct at the inception of the combination or agreement." [The plaintiff] can prove intent by "circumstantial evidence and reasonable inference."

Conceal City, L.L.C. v. Looper Law Enforcement, LLC, Civil Action No. 3:10-CV-2506-D, 2013 WL 81485, at *3 (N.D. Tex. Jan. 8, 2013) (citations omitted).

In this case, plaintiffs allege that Wells and the Doe defendants have conspired to defame plaintiffs. (Compl, DE # 1, ¶ 107.) Plaintiffs' complaint contains a recitation of the elements of the conspiracy claim. (See id. ¶¶ 3, 106-11.) However, there are not sufficient factual allegations to support that there was a meeting of the minds. The only factual allegations which arguably might support the "meeting of the minds" element are the defamatory statements which Wells published "based upon information received by [her] from others, by email or other means . . . ." (Id. ¶ 59.) That Wells might have permitted others to independently post defamatory statements on her blogs or that she might have re-posted others' defamatory statements, even

20

with their consent, (see Wells Decl., DE # 18, ¶ 12),[9] does not support an inference that

defendants specifically intended to agree amongst themselves to defame plaintiffs.  Without

more, the court finds that plaintiffs have failed to state a claim of civil conspiracy.

G.      Copyright Infringement

Plaintiffs claim that Wells committed copyright infringement by her unauthorized use of

UBH's and Ascend's images, all taken from UBH's and Ascend's websites.  "A plaintiff

claiming copyright infringement must establish 'ownership of the copyright by the plaintiff and

copying by the defendant.'"  Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618

F.3d 417, 428 (4th Cir. 2010) (citation omitted).  Wells contends that the copyright infringement

claim should be dismissed as her alleged uses of the images are "fair."[10]

> Section 106 of the Copyright Act grants "a bundle of
> exclusive rights to the owner of the copyright," including the rights
> "to publish, copy, and distribute the author's work."  These rights,
> however, are "subject to a list of statutory exceptions, including
> the exception for fair use provided in 17 U.S.C. § 107."  Fair use is
> a complete defense to infringement.  In other words, "the fair use
> of a copyrighted work . . . is not an infringement of copyright."
> Fair use was a creature of the common law until 1976 when

---

[9]As stated above, the court is evaluating Wells's motion to dismiss this claim according to the Rule 12(b)(6) standard.  The court recognizes that a declaration should not normally be considered on such a motion.  However, in this case, the court merely cites the declaration as evidence which might arguably augment the allegations in the complaint and support plaintiffs' claim for civil conspiracy, thereby potentially preventing dismissal; in other words, the court is not considering the declaration on this point to the movant's, i.e., Wells's, benefit.

[10]Wells initially argues that because plaintiffs allege that they have *sought* registration for copyright protection of the subject images, (Compl., DE # 1, ¶ 56; see also id. ¶ 98 ("UBH and Ascend have filed with the United States Copyright Office to register their copyrights in the copyrighted materials."), rather than that they actually hold valid registrations of copyright, plaintiffs have not sufficiently pled ownership of a copyright, (see Def.'s Br., DE # 19, at 28-29).  Plaintiffs counter with the representation that on 5 July 2012, "the Copyright Office advised Plaintiff[s'] counsel that Copyright Registration Number TX 7-540-310 was issued for the UBHdenton.com Website and Copyright Registration Number TX 7-540-321 was issued for the AscendHealth.net Website, with registration certificates being mailed on that date."  (Pls.' Br., DE # 20, at 22.)  Some courts require a certificate of registration, rather than merely application for registration, as a prerequisite to filing suit for copyright infringement, while others do not.  See generally 2 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 7.16[B][3][b] (rev. ed. 2012).  Based on the court's resolution of the "fair use" defense, the court does not address this issue.

the doctrine was codified in § 107 of the Copyright Act. "Congress meant § 107 to restate the present judicial doctrine of fair use . . . and intended that the courts continue the common-law tradition of fair use adjudication." Accordingly, the doctrine of fair use continues to be applied as "an equitable rule of reason, for which no generally applicable definition is possible." The fair use inquiry is "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." Nevertheless, it is appropriate to use the four statutory factors listed in § 107 "[t]o guide the determination of whether a particular use is a fair use." The four factors are as follows:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

. . . . [T]he factors are not to be "treated in isolation," but rather "the results [are to be] weighed together, in light of the purposes of copyright."

Bouchat v. Baltimore Ravens Ltd. P'ship, 619 F.3d 301, 307-08 (4th Cir. 2010) (citations omitted) (some alterations in original).

Although "[t]he fair use defense presents a mixed question of law and fact," id. at 307 (citation omitted), the court is not precluded from ruling on this affirmative defense on a motion pursuant to Rule 12(b)(6), provided that the defense's applicability is apparent from the face of the complaint and from any documents which are appropriate for consideration on a Rule 12(b)(6) motion, see Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (recognizing that an affirmative defense may be reached on a Rule 12(b)(6) motion, albeit in rare circumstances, "where facts sufficient to rule . . . are alleged in the complaint" and analyzing whether the district court properly dismissed the complaint on an affirmative defense by looking to the allegations in the complaint and a copy of a document included with the complaint). Here,

plaintiffs attached to the complaint copies of the web pages on which Wells posted the images. (Compl., Exs. A-E, DE ## 1-1 to 1-5.)  Those images, posted alongside Wells's statements, are images of UBH's facility; an image apparently of Ascend's officers, including Kresch; an image of UBH's logo; and, a still image of a man outdoors with other people in the background from a UBH promotional video.  (Id.)  The copies of the web pages containing the images and Wells's concomitant statements combined with the allegations in the complaint, (see Compl., DE # 1, ¶¶ 29(h), 29(i), 37, 39, 54), enable the court to appropriately evaluate on the motion to dismiss whether Wells's use of the images was fair.

The parties' debate regarding the fair use defense centers on the first and fourth statutory factors identified in Bouchat.  Because they do not address the second and third factors, the court presumes those factors are neutral in considering the use.  The first factor the court considers is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  Bouchat, 619 F.3d at 308.  "This inquiry 'may be guided by the [fair use] examples given in the preamble to § 107, specifically, 'criticism, comment, news reporting, teaching . . . scholarship, or research.'"  Id. (citations omitted) (alteration and omission in original).  There is no doubt that Wells's use of the images is to criticize UBH's and Ascend's purported business practices.  For example, Wells uses many of the subject images on the Facebook page she created entitled "UBH Denton Sucks."  (See Compl., DE # 1, ¶ 39 & Ex. D, DE # 1-4.)  The "Community" of the page identifies UBH as "a private freestanding psychiatric hospital specializing in insurance fraud and false imprisonment of voluntarily-admitted patients," and next to images of UBH's courtyard and logo, Wells posted:

> They cleaned up all the cigarette butts and removed all the chain
> smoking patients who are medicated and look like zombies just for

23

> this picture.  And, if you could actually see where the
> photographer is standing, and what's behind him, you'd see a huge
> wall.  As in, to keep you confined until your insurance benefits run
> out.

(Compl., Ex. D., DE # 1-4.)  The juxtaposition of the serene image and Wells's direct statements

about the image serves to illustrate her criticism.

Even though Wells's use of the images as criticism falls within one of the statutory, fair

use examples, fair use is not presumed; Wells must also show that the purpose behind her use is

"transformative."  See Bouchat, 619 F.3d at 309 ("Even the six uses specifically listed in the

preamble to § 107 do not create presumptive categories of fair use protection.  A transformative

purpose is also required." (citation omitted)).  "A transformative use is one that employs the

copyrighted work in a different manner or for a different purpose from the original, thus

transforming it."  Id. at 308-09 (quotation and citation omitted) (alterations removed).

UBH and Ascend use the images on their websites to convey that they provide quality

healthcare services to attract potential customers.  (Pls.' Br., DE # 20, at 26.)  Wells uses the

images for a different reason, that being, to criticize the two companies.  As such, this use is

transformative.  See Sedgwick Claims Mgmt. Servs., Inc. v. Delsman, No. C 09-1468 SBA, 2009

WL 2157573, at *5 (N.D. Cal. July 17, 2009) (finding that defendant's use of photographs of

two of plaintiff's executives as a vehicle for criticizing plaintiff's alleged business practices was

"fundamentally different" than the original promotional reason), aff'd, 422 F. App'x 651 (9th

Cir. 2011).  That Wells did not alter the images, including UBH's logo, does not preclude her

use from being transformative.  See Bouchat, 619 F.3d at 314 (concluding that the use of a

copyrighted sports logo in a museum-like setting added "'something new'" to the original

purpose as a symbol identifying the sports team itself); A.V. ex rel. Vanderhye v. iParadigms,

24

LLC, 562 F.3d 630, 639 (4th Cir. 2009) ("The use of a copyrighted work need not alter or augment the work to be transformative in nature. . . . [T]he fact that there was no substantive alteration to the works does not preclude the use from being transformative in nature."); Sedgwick, 2009 WL 2157573, at *5 (where defendant did not alter photographs, recognizing that "'making an exact copy of a work may be transformative so long as the copy serves a different function than the original work'" (quoting Perfect 10, Inc. v. Amazon.com, 508 F.3d 1146, 1164 (9th Cir. 2007)).

In considering the purpose and character of the use, the court must also examine "'whether [the] use is of a commercial nature or is for nonprofit educational purposes.'" Bouchat, 619 F.3d at 310 (quoting 17 U.S.C. § 101) (alteration in original). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." Id. at 311 (quotation and citation omitted). Here, Wells's use of the images is non-commercial. Nothing indicates that she charges anyone to view her blogs or that she otherwise profits in any way from her posting of the images. Considering the non-commercial nature of Wells's use of the images combined with the transformative purpose, the court weighs the first factor in favor of a finding of fair use.

The fourth factor, which is the most important in considering fair use, is "the effect of the use upon the potential market for or value of the copyrighted work." Id. at 312 (quotation and citation omitted). Instructive here is the case of NXIVM Corp. v. Ross Inst., 364 F.3d 471 (2d Cir. 2004), where the plaintiff provided a copyrighted course manual to paid subscribers of its seminar training. The defendants were involved in publishing excerpts from the manual in

reports critical of the plaintiff's program, with such reports being made available to the public on nonprofit websites. Id. at 475. In evaluating market effect, the court stated:

> The fourth statutory fair use factor requires us to evaluate the economic impact of the allegedly infringing use upon the copyright owner. The focus here is on whether defendants are offering a market substitute for the original. In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work. As we stated in [another case], the relevant market effect with which we are concerned is the market for plaintiffs' "expression," and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters, not the effect of defendants' work as a whole. That the fair use, being transformative, might well harm, or even destroy, the market for the original is of no concern to us so long as the harm stems from the force of the criticism offered. See [Campbell v. Acuff–Rose Music, Inc., 510 U.S. 569, 591-92 (1994)] ("[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act.").
>
> This factor weighs heavily in defendants' favor. It is plain that, as a general matter, criticisms of a seminar or organization cannot substitute for the seminar or organization itself or hijack its market. To be sure, some may read defendants' materials and decide not to attend plaintiffs' seminars. Indeed, the record reflects that soon after the dissemination of defendants' material, actress Goldie Hawn cancelled a visit with [the plaintiffs'] leader, Keith Raniere. But that sort of harm, as the district court properly recognized, is not cognizable under the Copyright Act. If criticisms on defendants' websites kill the demand for plaintiffs' service, that is the price that, under the First Amendment, must be paid in the open marketplace for ideas.

Id. at 481-82 (most citations omitted) (some alterations in original).

In this case, like in NXIVM, plaintiffs apparently suffered harm to the market for their services. But, as to the images themselves, which the copyright protects, there is no market or intrinsic value. Without any potential effect on the market for the images or their value, this factor favors a finding of fair use.

26

Considering that the first and fourth factor weigh in favor of fair use and the other factors are neutral, the court concludes that Wells's use of UBH's and Ascend's images is fair, and the copyright infringement claim must therefore be dismissed.

## III.  CONCLUSION

For the foregoing reasons, the motions to dismiss are GRANTED IN PART and DENIED IN PART.  Plaintiffs' first and second claims, which arise exclusively under North Carolina law, civil conspiracy claim, and copyright infringement claim are dismissed.  Plaintiffs' claims for libel and business disparagement under Texas law remain.  Although plaintiffs request leave to amend their complaint "to the extent this Court finds Plaintiffs' Complaint lacking," (Pls.' Br., DE # 20, at 27), the deficiencies noted in regard to the claims dismissed cannot be cured by amending the complaint at this time.

This 14 March 2013.


_____
W. Earl Britt
Senior U.S. District Judge